NOTICE
This Order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

2024 IL App (4th) 240003-U

NO. 4-24-0003

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

FILED
April 9, 2024
Carla Bender
4th District Appellate
Court, IL

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. CHRISTOPHER SHEA, Defendant-Appellant. | ) ) ) ) ) ) ) ) ) | Appeal from the Circuit Court of Peoria County No. 23CF726 Honorable Paul P. Gilfillan, Judge Presiding. |

PRESIDING JUSTICE CAVANAGH delivered the judgment of the court.
Justices Steigmann and Doherty concurred in the judgment.

**ORDER**

¶ 1   *Held*: Because defendant continues using cocaine despite having undergone drug rehabilitation treatment, and because it is his drug addiction that causes him to persist in committing dangerous felonies (according to his mother and his defense counsel), the circuit court could reasonably find, by clear and convincing evidence, that no combination of pretrial release conditions would mitigate defendant's dangerousness to the community; therefore, the court did not abuse its discretion by granting the State's petition for the denial of pretrial release.

¶ 2   The State petitioned the circuit court of Peoria County to deny pretrial release to defendant, Christopher Shea. The petition was pursuant to article 110 of the Code of Criminal Procedure of 1963 (Code) (725 ILCS 5/art. 110 (West 2022)), hereinafter as amended by Public Act 101-652, § 10-255 (eff. Jan. 1, 2023), commonly known as the Pretrial Fairness Act (Act). See Pub. Act 102-1104, § 70 (eff. Jan. 1, 2023) (amending various provisions of the Act); *Rowe v. Raoul*, 2023 IL 129248, ¶ 52 (setting the Act's effective date as September 18, 2023). The court granted the petition, finding the State had proven, by clear and convincing evidence, that no

conditions of pretrial release would mitigate defendant's dangerousness and likelihood of willful flight. See 725 ILCS 5/110-6.1(e)(3) (West 2022). Because we find no abuse of discretion in the granting of the State's petition, we affirm the judgment.

¶ 3                                I. BACKGROUND

¶ 4            On September 11, 2023, the State filed an information charging defendant with the Class 2 felony of failing to report an accident involving a personal injury (625 ILCS 5/11-401(b), (d) (West 2022)). On October 2, 2023, the information was superseded by an indictment charging defendant with the same offense.

¶ 5            Also on September 11, 2023, the circuit court set bail at $80,000. The court ordered that, to be released from custody, defendant had to post 10% of that amount as security. He remained in custody.

¶ 6            On December 14, 2023, pursuant to section 110-7.5(b) of the Code (725 ILCS 5/110-7.5(b) (West 2022)), defendant moved for reconsideration of the conditions of pretrial release.

¶ 7            On December 20, 2023, the State filed a verified petition for the denial of pretrial release. In the petition, two boxes were checked. One box corresponded to preprinted language asserting that (1) defendant was charged with a forcible felony listed in section 110-6.1(a)(1.5) of the Code (*id.* § 110-6.1(a)(1.5)) or, alternatively, he was charged with a felony "involv[ing] the threat of or infliction of great bodily harm o[r] permanent disability" and (2) allowing his pretrial release would "pose[ ] a real and present threat to the safety of any person or persons or the community." The other box had preprinted language asserting that defendant "ha[d] a high likelihood of willful flight to avoid prosecution." See *id.* § 110-6.1(a)(8).

¶ 8        The same day the State filed its petition, the circuit court held a hearing on the petition and on defendant's motion for reconsideration of the conditions of pretrial release. At the hearing, the court considered a pretrial services report, dated September 11, 2023, which disclosed the following information. Defendant is 44 years old and homeless. If released, however, he would live with his mother, Sandra Curry, in Dunlap, Illinois. Although he does not have a phone, he could be reached at Curry's phone number (which he provided). He has a history of cocaine use and used cocaine a week before the pretrial services interview. He is single but has two children, who are three and five years old, and he has another child on the way. He "[r]eports he provides $1000 in support for the children" but that no court has ordered him to do so. He works full-time as a union painter, earning $40 an hour, and he has an associate's degree. He underwent "treatment at the Crisis Center," where he was "[d]etoxed." He has three failures to appear and three prior convictions, two of which are felony convictions. Specifically, in a Missouri case dating from 2011, he was convicted of robbery, for which he received a prison sentence of 10 years. In an Illinois case from 2012, he was convicted of domestic battery, for which he received probation for 12 months. In an Illinois case from 2013, he was convicted of aggravated robbery, for which he was sentenced to imprisonment for 20 years.

¶ 9        The report read as follows under "Recommendation":

"The Revised Virginia Pretrial Risk Assessment Instrument (VPRAI-R) performed by Pretrial Services identifies the defendant's risk of pretrial misconduct while on pretrial for this alleged offense. The defendant scored a 6 (Moderate Risk) out of possible score of 0-14.

Based on the defendant's risk of misconduct and the nature of the offense, the defendant appears to be appropriate for Pretrial Release.

Furthermore, based on statistical norms, this assessment would estimate the defendant has high probability to appear in court for all future court hearings and (95%) of no new offenses during the pendency of this case."

¶ 10   The prosecutor made substantially the following proffer. Zachary England was the manager of Firestone on North Knoxville Avenue in Peoria, Illinois. On September 9, 2023, defendant entered the shop, purportedly to pay for repairs he had ordered on a car. The bill was over $2000. While at the counter, he grabbed the car keys. He "jumped in the car to take off without paying for the repairs." While "pursuing [defendant] to try to get him to stop and pay," England "was struck and injured in the roadway and left in the roadway." Defendant drove away, "leaving *** England lying in the middle of Knoxville" Avenue, "bleeding from the head," suffering from (as it turned out) a "traumatic brain injury." Other motorists "had to put cars in the way to keep [England] from being run over." The police found defendant in the bathroom of a rented house. In a laundry hamper in the house, they found the keys to the car, which, it was later learned, had been reported stolen.

¶ 11   The prosecutor continued:

"We would indicate if you look at the defendant's pretrial services report he indicates he's homeless, does not have a phone, indicates he would live with his mother if he was released. He does have a prior history of failure to appears [*sic*] which I know can't be the only consideration. He also has a no-bond hold at the Peoria County Jail from the City of Peoria Police Department [for theft of a motor vehicle]. ***

I would indicate as well he has a lengthy criminal history. He had an armed robbery, 2013, which he was sentenced to 20 years in the department of corrections.

So, he's not been out very long. He had a prior robbery out of St. Louis, Missouri, in 2001 for which he was sentenced to 10 years, and he has a domestic battery conviction."

(Later in the hearing, the prosecutor corrected herself by informing the circuit court that the 2013 conviction was for aggravated robbery instead of armed robbery.)

¶ 12     For the following reasons, the prosecutor argued that defendant was "a flight risk": "The inherent nature of this offense is a flight risk. He fled the scene of an injury with great bodily harm and was located in a house. He did not ever turn himself in or come forward to indicate what he had done. He was also involved in possessing a stolen motor vehicle as a part of this offense. He was charged with reckless driving as well for his driving to leave the scene of that accident."

¶ 13     The circuit court asked the prosecutor:

"THE COURT: How many prior failures to appear did you say?

[THE PROSECUTOR]: It says in his pretrial services report three. When I look at the jail screen, it actually shows four. But I was going with—the pretrial services report has three failures to appears [*sic*].

THE COURT: Does it show the most recent one of those?

[THE PROSECUTOR]: *** It was in January of 2023."

¶ 14     The defense called Sandra Curry, who testified essentially as follows. She was defendant's mother, and she lived in Dunlap. If defendant were released, he "[a]bsolutely would" be able to live with her. She "would indeed" "make sure" he abided by any court-ordered conditions of pretrial release, including wearing an ankle monitor, abstaining from drugs and alcohol, and attending meetings and work. Defendant was a "painter with the local union." The

union hall had urged her that, "as soon as he got out and got adjusted[,] to let them know, and they would have him back at work." She acknowledged that defendant had "had scrapes with the law." She "believe[d] his entire record ha[d] been related to addiction issues." She "would do whatever [she] needed to do to support him and his recovery."

¶ 15    On cross-examination, Curry testified that she had lived at her address in Dunlap for 22 years. She was unsure where defendant resided at the time of the incident—she thought he had been living with some friends "[s]omewhere in Peoria." Defendant had not lived with her since "near the end of summer" 2023. The prosecutor asked her:

"Q. So, why did he move out? Did he move out on his own or did you kick him out?

A. Well, it was a mutual thing where he was not doing what I asked him to do as far as like allowing the tracker on his phone. I wanted to have that on his phone so I could keep track of where he was, and he was having a difficult time accepting that, so I told him it needed to be on or he had to get out.

* * *

Q. And was he back to using drugs?

A. He had been using drugs, yes.

Q. Where do his children live?

A. He doesn't have any children. He's not married or anything.

Q. So, if he reported that he had two children, a three and a five year old and one on the way, you know nothing about them?

A. I do not."

¶ 16    The prosecutor asked:

"Q. So, when he paroled out after his last—that 20-year prison sentence, did he come live with you?

A. He did.

Q. Okay. And then that didn't last long or?

A. It lasted a while[,] actually. He was working. He was doing everything perfect and just made a bad decision one day to do drugs again."

¶ 17　　　　On redirect examination, Curry testified that defendant "did have a girlfriend." This girlfriend "was unsure if he was the father or not, but it was suspected that he was the father, and she had a miscarriage in—around October." Defense counsel asked:

"Q. She also had the two children to your knowledge?

A. You know, I don't really get involved in all of his girlfriend's history so—

Q. Fair enough.

A. —I am not aware of that.

Q. Okay.

A. I think I heard some hearsay that she did have two children but that's it."

¶ 18　　　　At the conclusion of Curry's testimony, defense counsel remarked to the circuit court, "It's not very often you have somebody who is as honest and blunt testifying in court as one of [*sic*] my client's mother." The court responded, "I agree." Characterizing Curry as a "no nonsense type of person," defense counsel argued that if defendant did not "do what he [was] supposed to do," Curry would be "willing to take the necessary steps." In defense counsel's assessment, Curry was just the sort of "person who would" "inform probation."

¶ 19      Next, defense counsel sought to dispel what he regarded as a misleading suggestion that was made in the State's proffer:

> "I would disagree, respectfully, with [the prosecutor's] characterization as mowed him down. This is a person who jumped on a car, and that's what Mr. England did. And according to the proffer, did my client drive off? Yes. He didn't stop. I'm not going to argue with that. But it's not as though he ran in—over somebody who was standing in the roadway or crossing the road."

¶ 20      Acknowledging that defendant had "a significant history," defense counsel pointed out that "all of [these prior offenses] *** [were] of the type and nature that it would be involving someone with addiction issues."

¶ 21      Defense counsel concluded:

> "And as far as safety to the public, I think the Court can assure itself that if he's wearing a monitor, that if he's being tested regularly, he is a person that can go out. He's got a place to stay. He's got somebody that's going to monitor him, and he's got the ability to work. I think he's safe to be released."

¶ 22      After defense counsel made his argument, the circuit court found that the "hurdle" in section 110-6.1(e)(1) of the Code (725 ILCS 5/110-6.1(e)(1) (West 2022)) "ha[d] been crossed fairly easily here by the State." In other words, the State had carried its "heavy burden of proving by clear and convincing evidence that the proof [was] evident or presumption great that the defendant [had] committed the offense listed in the indictment." In his "terribly reckless act" at Firestone, defendant had shown a "call[o]us disregard for the safety of others."

¶ 23    The circuit court further found that the State had proven, by clear and convincing evidence, the proposition in section 110-6.1(e)(2): that defendant "pose[d] a real and present threat to the safety of *** the community." *Id.* § 110-6.1(e)(2).

¶ 24    The final proposition that the State had to prove, by clear and convincing evidence, was that

> "no condition or combination of conditions set forth in subsection (b) of Section 110-10 of this Article [(*id.* § 110-10(b))] can mitigate (i) the real and present threat to the safety of any person or persons or the community, based on the specific articulable facts of the case *** or (ii) the defendant's willful flight." *Id.* § 110-6.1(e)(3).

The court found that this final proposition was proven as well. The court gave eight reasons for so finding.

¶ 25    First, defendant "does not have a phone," and "[p]retrial services was uneasy about that."

¶ 26    Second, "[e]ven when [defendant] had a phone, [he] rebuffed his mother's efforts to track him wherever he would go, and this was just recently." The circuit court reasoned, "His mother as recently as August of this year tried to get control over him, and he simply refused. What's to say that he's going to change his mind a few months later?"

¶ 27    Third, defendant had an "unstable relationship life" in that he lacked a "long time partner" who might "provide some stability." The court commented, "And what a shocking revelation to hear that this good mother was not aware of whether she has any grand kids or not through her son, unstable."

¶ 28         Fourth, defendant had "failed to show up for court." The circuit court added, "I don't care if it was a traffic ticket or any other type of charge. That does not bode well."

¶ 29         Fifth, defendant had "another case pending something to do with motor vehicle theft." That pending charge was "not a factor in his favor."

¶ 30         Sixth, defendant had "a lengthy criminal history," including "a history of violent acts and being a threat to the safety of others."

¶ 31         Seventh, defendant "drove off" from Firestone, "evading authorities, parking a car in an alley before he was finally tracked down."

¶ 32         Eighth, defendant "admitted to pretrial services that his last use of cocaine was just a week before that interview." The circuit court added:

> "I appreciate the scourge of addiction and the harm it causes to individuals let alone society, but I don't know that that's a positive supported detail for the defendant here. He's had addiction for a long time that is not under control whether through his own devices or through seeking help of others. And I don't think this is the time to experiment and see if his addiction can get under control so close in time to the incident we're here for today."

¶ 33         The circuit court concluded:

> "Also, the option of supervising him in a safe manner, in a less restrictive manner than detainment, to me, I think [it] would be in a twist of phrases a little bit reckless of the Court to let him go out in society under these dire circumstances that he's facing right now and with his history. So, motion of the State's respectfully granted."

¶ 34    In the written pretrial detention order, the circuit court found the propositions in section 110-6.1(e)(1) to (3) (*id.* § 110-6.1(e)(1)-(3)) to be proven. In addition, the court found the willful flight standard in section 110-6.1(a)(8) (*id.* § 110-6.1(a)(8)) to be proven. For its written findings, the court referred the reader to its remarks in the transcript of the pretrial detention hearing. Also, the court wrote:

> "[T]he risk of flight does not fall in the defendant's favor and the defendant's likelihood of having a stable environment when released is minimal. Further details and specifics are stated on the record.
>
> numerous reasons: facts of case; flight; addiction; crim. hx.; refusal to follow mother's rules; unstable life relshps; attitude, etc."

¶ 35                                II. ANALYSIS

¶ 36    The only issue that defendant raises in the memorandum that he filed in support of his appeal is whether the State proved, by clear and convincing evidence, the proposition in section 110-6.1(e)(3) of the Code (*id.* § 110-6.1(e)(3)). That section reads as follows:

> "(e) Eligibility: All defendants shall be presumed eligible for pretrial release, and the State shall bear the burden of proving by clear and convincing evidence that:
>
>                                * * *
>
> (3) no condition or combination of conditions set forth in subsection (b) of Section 110-10 of this Article [(*id.* § 110-10(b))] can mitigate (i) the real and present threat to the safety of any person or persons or the community, based on the specific articulable facts of the case, for offenses listed in paragraphs (1) through (7) of subsection (a) [(*id.* § 110-6.1(a)(1)-(7))] , or (ii) the defendant's willful flight

for offenses listed in paragraph (8) of subsection (a) [(*id.* § 110-6.1(a)(8))]." *Id.* § 110-6.1(e)(3).

¶ 37 Defendant challenges the circuit court's logic that, just because he refused to allow his mother to install tracking software on his cell phone, court-ordered conditions of pretrial release, such as "GPS monitoring, combined with curfew or strict home detention at [his] mother's house," would have no mitigative effect on his dangerousness to the community or his likelihood of willful flight. He argues that there is a significant difference between the (unaided) coercive power of his mother and that of a court of law. He points out that the court, "unlike [his] mother, has authority to instruct law enforcement officers to lay hands on 44-year-old men, at least those who are facing criminal charges before it."

¶ 38 It is true that the circuit court has sanction powers that Curry lacks. See *id.* § 110-6(f). If defendant violated a condition of pretrial release, the court could sanction him with—on the more severe end—"imprisonment in the county jail for a period not exceeding 30 days." *Id.* § 110-6(f)(2). In the past, however, the prospect of decades of imprisonment did not deter defendant from repeatedly committing robbery. Arguably, then, the prospect of a month in the county jail would be a relatively trivial deterrent. The reason why defendant has been undeterred, one might understand from the record, is that he has a drug craving that will not be denied. According to Curry and defense counsel, all of defendant's criminal wrongdoing over the years has been owing to his drug problem. Given the choice between homelessness and allowing his mother to install tracking software on his phone so she could make sure he was not going out for drugs, defendant chose homelessness. Therefore, a reasonable trier of fact would have some basis in the record for perceiving the futility of GPS monitoring and confinement to Curry's house. Given defendant's unwillingness to accept a tracker on his cell phone, there arguably is little reason

to expect he would submit to a more intrusive GPS ankle bracelet, despite defense counsel's assurances. If defendant contemplated going out and committing a wrong that might get someone else hurt, a GPS monitor would suggest to him that he should stop, and the commands in a pretrial release order would suggest to him that he should stop. But defendant does not stop, not even when a justly aggrieved shopkeeper jumps on the stolen car that defendant is speeding away in. A fair-minded, reasonable trier of fact, accepting the explanations of defendant's mother and defense counsel, could see defendant as someone who is ruled and constrained by a drug addiction that has proven resistant to treatment—an addiction that would sweep away any conditions of pretrial release, just as it has swept away other important considerations, such as other people's safety.

¶ 39    So, we are unable to say that, by granting the State's petition for the denial of pretrial release, the circuit court abused its discretion. See *People v. Inman*, 2023 IL App (4th) 230864, ¶ 10. That is, we are unable to characterize this ruling as arbitrary, fanciful, or unreasonable. See *id.*

¶ 40                             III. CONCLUSION

¶ 41    For the foregoing reasons, we affirm the circuit court's judgment.

¶ 42    Affirmed.